cases against a bunch of insurance companies. So with that, we will begin with Rafi Melkonian for the insurance companies. Thank you, Your Honors, and may it please the Court, Rafi Melkonian for the appellants in the Town of Vinton and Cameron Parish cases. I'm also counsel for the appellants in One Lakeside, which we're going to hear right after this one. And candidly, I think the arguments in both of those buckets of cases are going to be very similar. I'm going to give you my full argument in this case, and we think this case is resolved by the text of the policies that are the same in each of the three cases and by the text of the Convention. So I'm going to give you my argument in Lakeside. Of course, I'm open to whatever questions Your Honors still have after the argument. If Your Honors will indulge me for just 30 seconds, I want to talk a little bit about what these cases really are about, and then I'll move to the substance. These are surplus lines insurance cases. And as Your Honors will know, surplus lines insurance is the insurance of last resort. In most states, you have to go to the domestic markets before you go to the surplus lines market, and you have to certify that you tried to do that. And to get the best premiums for those surplus lines policies for these catastrophic events, you often have to go into the international market. And to get into the international market, to get your Lloyds and those other insurers, you often must agree to an arbitration provision, because those kinds of insurers need the predictability and sort of stability of arbitration, and that's exactly what the United States promised them in the New York Convention when it entered into that treaty and implemented the treaty under the Chapter 2 of the FAA. So that's what we think is going on. This is incredibly important to our clients and incredibly important to insurers throughout the Fifth Circuit to make sure that these policies are available. Now, why do we prevail in this case? For what it's worth, I don't understand your introduction and how it helps you, because there's no foreign insurer at issue in this case, is there? They've dropped out. Your Honor, there's no foreign insurer that's a party to this case, but there's foreign insurers that are a party to the policy. Okay, but your whole intro was premised on the notion that foreign international insurers really need arbitration before entering into U.S. contracts. That problem is solved no matter how we decide that case. Well, Your Honor, I'm not going to argue about the policy with Your Honor. I don't want to—That's fine. I just didn't understand your intro is all. I understand, Your Honor. I'm sorry about that. Let me get to the substance. We prevail under the New York Convention and the text of this policy, because what the Convention says is if there is an arbitration agreement with at least one foreign party in the case, then that arbitration must be compelled, and state law is preempted with respect to that. And McCarran-Ferguson is preempted with respect to that under safety national. So really the only question left in this case, and this is what this Court said in the Bufkin panel opinion that is at issue here, is whether this policy contains an arbitration agreement with one foreign entity. And the answer to that is yes. If you look at Record on Appeal, page 91, that's the arbitration agreement in the Town of Vinton policy. You're going to see the arbitration agreement. It says, all matters in difference between the insured and the companies in relation to this insurance shall be referred to an arbitration tribunal as set out. And companies is defined in the supplemental declarations, which are a few pages later, as including all the insurers, including the foreign insurers. Well, a big part of this case is the argument that these are separate contracts versus this is all one contract with just a little trickle of separate, only meaning that each insurer does not have to pay for every insurer. So explain to us, I know which one you think. You think it is combined, except for the little trickle of separate. Please explain why that we should view it that way. And, of course, we'll ask the other side why we should view it their way, that it's all separate. Absolutely, Your Honor. Let me take you directly to that provision that's in the contract allocation endorsement, which is at ROA 51 of the Town of Vinton record. By the way, I should just say as a note, these appear a second time in the Town of Vinton record. That's not a There's just one document in this case. That's just the second copy of the same policy. But let's go to ROA 51, excuse me, 52. That's where this provision you're talking about is. The contract will be constructed as a separate contract between the insured and each of the underwriters. What does that mean? Our view, as Your Honor noted, is that there is an overarching policy, this document, that contains all the terms and conditions of the policy, including the arbitration provision. And then there are contracts that set forth the liability of each insurer with respect to the insurance promised by this whole policy. And the proof of that, there is textual proof that it works exactly the way I say on the very next page, ROA 53 in the contract allocation endorsement. And I would point Your Honors to the first and last sentences of the second paragraph of that page. The liability otherwise determined to exist under the terms and conditions of this policy, so you determine the liability by looking at this document, the policy, shall be borne by the contract covering the proximate cause of loss identified in the allocation of security. So the way I see it, that sentence tells you that the policy is the overarching document, and then the contract is the internal machinery of the surplus lines policy. The liability is determined at the level of the policy, and then it filters through into the individual contracts that sit below the policy. I'd also point Your Honors to the last sentence of that same paragraph. The liability of the policy shall not be increased or decreased by any condition of the allocation to specific contracts on this endorsement. So again, that's entirely consistent with our reading of this policy, which is that there's a broad policy, there's one document, and then the liability filters through into the contracts that are below it. And when this policy talks about the policy, it uses the word policy, that's the big document. When it means contract, it means these individual contracts with the insurers, it says the word contract. That is not an accident. It's not a drafting error. The policy is the broad document. It includes the arbitration provision. And the argument my friends on the other side are going to make when they get up is that that one sentence on the previous page somehow transmortifies this single policy into ten different policies, each including an arbitration provision, and somehow amends the arbitration provision on ROA 91 to say that all matters in difference between the insured and each of the companies in relation to this insurance shall be referred to arbitration. It just doesn't say that. Counsel, I want to make sure I get it. So the idea is that contract and policy are different. There's one policy in multiple contracts. That's right, Your Honor. So there's an overarching policy and these contracts sitting below. So what do we do with the several liability notice? Because the several liability notice, this is, I can't remember which one of, this is 2430748, so I don't remember which party that is. But it's record on Appeal 78. And it's the provision that says the liability of an insurer under this policy is several and not joint with other insurers party to this policy. Right? So that makes it pretty clear that there's multiple policies, right? Because each insurer, each insurer has its own policy with each of the, with the insureds. And it's not just that sentence, right? It's also the last sentence of that paragraph, nor is an insurer otherwise responsible for any liability of any other insurer that may underwrite this policy, right? Policy is capitalized, right? So it seems like that is pretty clear textual indicia that each insurer has its own capital P policy with the insured. So we are not arguing, Your Honor, that there is not a, there's not something that the contract refers to as a policy with respect to each individual insurer. The question is whether this policy, the big policy, is an overarching document that includes all the insurers. Is this not in the big policy? It's in the big policy, but we think that's referring, so if you look at the declarations page, there are both contract numbers and policy numbers for each of the individual insurers. We think that's what it's referring to. But the big policy, the policy that contains the terms and conditions, that's this document. And that document includes the arbitration provision that covers everybody. But the arbitration provision and the several liability notices in the same, I just want to make sure you and I are using the same phrase, the same big policy. They're in the same big policy, but what you're reading to me refers to the individual policies that are listed on the declaration. So there's actually three terms now. So there's the big policy, then maybe when you would call it the little policy, which would be this, and then the contracts. Maybe so, Your Honor. And is there any provision anywhere in this contract that would give me a basis for like differentiating those three things? There is not a provision that defines them, but I think the way it's used in the contract allocation endorsement is a strong indication that I'm right about that. But I would also point you to the settlement of claims provision. So if you look at the settlement of claims provision, which is ROA 97 of the record, that says the amount of loss for which the companies may be liable shall be payable within 30 days, et cetera, et cetera. And the ascertainment of the amount of loss is made either by agreement or an amount determined by binding arbitration in accordance with the provisions of this policy. So the way this whole structure works is that there's this overarching policy. There's an arbitration agreement within that policy. That's how you determine what people owe under the big policy. And then, yes, there are these underlying contracts and quote-unquote policies with the individual insurers. But that is not what that provision is talking about, and it's not what the provision of the— I mean, are you saying like if they needed a million dollars, that would be in the large policy, a million, and then each individual little contract would say, oh, 10 percent, 15 percent, whatever. So it would be that one insurer would be paying the 10 percent of the million, but the million is the big thing. That's exactly right. That's basically what you're saying. Yes. And if we were to say, eh, the main policy doesn't exist, then wouldn't that take out a lot of issues that the plaintiffs need? If the main policy doesn't exist, there's no exclusions, there's no coverage, there's none of the provisions that govern everything. So that has to be put together. So then I'm just finding this a little hard to understand why they create this sort of separate contract without making it clear it's part of the whole thing, or you think it is clear that it's part of the whole thing? I think it's very clear. I think that if you read that, the two sentences of the contract allocation endorsement that I pointed, Your Honors, to, I think that really establishes that what's going on is that there's this contract, the policy, that governs how the relationship between the parties is handled, and then there's these other things. I mean, the way I was thinking about it, Your Honors, this morning, is what if this were like a master services agreement, and then the policies are purchase orders? If there's an arbitration agreement in the master services agreement, that covers all the purchase orders. You don't get to sue under the purchase order and then say, I'm immune from the arbitration agreement that I signed when I bought this policy at the extremely good terms I bought the policy on. And that makes perfect sense to me. If you write the contract of adhesion to your insured or, in your circumstance, the purchaser, to say each one of the, you know, this is one master services agreement that applies to every single purchase order, the wrinkle obviously is that the contract of adhesion in this circumstance doesn't say that, right? The contract says you have individual, you know, each one of these is individual. The liability is not joint and several. The liability is individual. And then you also have these, like, I'm with you on trying to, like, understand the difference between contracts and policies, but, like, the thing is full of confusing capital P policies, right? So, I mean, if you look at the declarations page, so this is exhibit two, record on appeal 30748.36, each one of the different insurers have its own policy number. I agree. Right? Capital P policy numbers. So is that big policy, little policy, some other policy? Those are little. Those are little. Those are little policies. Even though it's capital P, that's... Even though it's capital P, because I think if you... I mean, look, we all have to try to harmonize this document in order to understand what it's doing. And I would say our friends on the other side really have no reading that gives any weight to what the arbitration provision says, what the contract allocation endorsement says, what any of that says. If we're going to try to harmonize it, we, I think, are the closest to what this means. And it's also consistent with the New York Convention, the strong emphasis on, you know, giving international parties the ability to get arbitration when they come to the United States. And so I think that's what this document is doing. What's your best argument for the concept that, you know, having the foreigners in the huge policy, even though they're gone now, makes it the convention? Your Honor, the cases that interpret the convention in this court and in the Supreme Court all say that the convention is triggered if at least one party to the agreement is a foreign entity. They don't have to be a party to the litigation. So it's just as if there was a big arbitration agreement, it covers everybody, and they sued only one of those entities, that person can still trigger arbitration in a normal kind of commercial dispute. What do you make of the cases that the other side cites, all the court cases that construe the separate contract language as indeed creating... Yes, Your Honor. ...the contracts? Candidly, those are district court cases. They all are. I don't think they have... Do you have any cases on your side on this issue? We do not have. I don't think we have a case from a district court on our side. They've got several, right? Yes. Yes, Your Honor. But what we think is... They're all wrong. And that's possible. I just want to understand your argument. All these judges are wrong. You don't have any judges to date on your side. But we should conclude that they're all wrong. That's our job. We do reverse district courts. I understand that. I have two better responses to that.  And everyone is wrong. I just want to give you your best shot on these cases. I do think everyone is wrong. Okay. But let me give you two other answers. One is that what's happening there is that people are following a case from a long time ago that did say that, and then they kind of follow along. And we win some of those cases, but we win them on equitable estoppel. And so the judges...  ...where we win on equitable estoppel... But you want to... I mean, you're doing that same argument. You're making both arguments here as well. We're making both arguments. You have consistently lost on the first. We have consistently... And the second, I believe, is now foreclosed. Or I guess you'll dispute that. Oh, no, no. We don't think it's foreclosed at all. You don't concede that, but all right. We actually think it's... The Louisiana Supreme Court case is all I meant. But anyway, we think we win on the first. I've always thought the first was a stronger argument because I think the text is fairly clear in our favor. And I think the district judges, unfortunately, have just erred on this. And we needed to come here to get that result. Okay. Thank you. You've saved time for rebuttal. And we'll now hear from the appellee. In this arraign, which is Thomas Flanagan for Town of Vinton et al. May it please the court and thank you. The district court properly denied the motions to compel arbitration. I'd like to discuss three points today. First is that the arbitration clauses are void for the domestic insurers. The Louisiana Supreme Court confirmed that last year. And so if Louisiana law applies to these questions, and we maintain that it does, then these parties should litigate their dispute in federal district court. Second, as for this discussion of separate policies versus one, there are separate policies according to the words that these insurers themselves put into the policies. On its face, the convention does not apply to contracts between U.S. parties. And the U.S. parties are the only ones with an actual case or controversy here. And finally, the insurer's attempt to use equitable estoppel fails based on Calcasieu Parish from the Louisiana Supreme Court. Their backup argument to use federal common law clashes with Supreme Court and Fifth Circuit jurisprudence. So let me get to the first issue, and maybe I could be extremely brief. There's no dispute that these arbitration clauses, albeit in surplus lines policies, are void in Louisiana. The Louisiana legislature had the ability to invalidate those clauses under the McCarran-Ferguson Act. Second, as to this issue of one contract or many, counsel has made his argument. So why was arbitration in this document if it's not ethical? Well, Your Honor, the Louisiana Supreme Court decided this point in 2024. Until that time, it wasn't clear. There was disagreement. Well, there was definitely a statute about that. Your Honor, there was. And the statute was written imprecisely, unfortunately. It talked about clauses that divest the courts of jurisdiction. There had been another Supreme Court case that talked about, well, what does that mean? Is it only for venue? And so there was some uncertainty there. The Supreme Court, on a certified question, resolved the uncertainty. And it said that, no, the clause refers to arbitration clauses, among other things, and so they are void in Louisiana. And again, I don't think there's any dispute. As to this issue of one contract or many, we start and maybe finish with the words on the page. And counsel read some of that contract endorsement, but not all of it. It does say the parties were as clear as they can be. This contract shall be constructed as a separate contract between the insured and each of the underwriters, but it doesn't stop there. It does not constitute in any manner or form a joint certificate of coverage by underwriters at Lloyd's, which is one of the foreign insurers, with any other insurance companies. And so the parties acted consistently with that mandatory language, shall, in an endorsement. And, you know, counsel talks about harmonizing. And in general, we do try to harmonize instruments, but when we can't, the endorsement controls. Well, in some contracts, particularly massive ones, can't be harmonized. It's right, Your Honor. It's not as if people have perfect information. Exactly. Maybe AI will cure that someday, but the fact is, humans make errors. That's right. Contracts, particularly massive insurance contracts, have inconsistencies. They do. That's a point of endorsement. And that's unavoidable. And sometimes an endorsement, like a clause in a contract that says not withstanding anything to the contrary herein, kind of clears away some of the confusion and identifies a particular issue that was important to the insurance companies. It was noted, there are separate policy numbers, they charge separate premiums, and so the words are clear. And so it's no different from interpreting a statute. When the words are clear, we generally stop. There's no suggestion that this is an absurdity. Why would it be absurd to do exactly what these insurers are saying? I would submit that if you have a direct answer to a question in an instrument, and yet you keep looking for tea leaves or breadcrumbs or turning the page askew to see if the light changes your view of it, you're no longer interpreting the contract. You're defying the direct wishes of the parties. We did cite seven cases going our way on this point. We could cite a dozen more. Again, there's plenty of these cases. It's unanimous. The insurers suggest that this was— Now, you're referring to the district court? I am, Your Honor. Yes, there's another dozen. I've been a district, a state district judge. I'm very respectful of district judges, but we are not required to follow their cases. We can view them and say, well, they're brilliant, but we don't agree with this one. So how are we bound by these district court cases? In no sense are you bound, Your Honor. Okay. In no sense. Again, I'm deeply respectful of district court judges, but I have done some reversals, so . . . I understand. And so the insurers suggest that really they were not trying to make these separate contracts, although they said that. What they're really trying to do is make it really clear that there's not going to be any joint and several liability. But the policies already said that. On page 30 of the base form, it said the liability of an insurer under this policy is several and not joint with other insurers. An insurer is liable only for the proportion of liability it is underwritten. But your opponent has said that is the thing. It's cubbying the people. You know, kind of like I said, the big policy gets you the million, but then this cubby says, okay, but this insurance company only has to pay for 10 percent, so they pay $100,000. That's the point. Why isn't that it? I mean, why does it take it completely away? Well, your Honor, what I would suggest is that the policies already contain the very thing that the insurers claim to want. This clarity that they're in their cubbyhole and they're liable only for what they're liable for, that was already in the policies before the endorsement. And yet we have an endorsement that not only repeats that but says more. It goes further and uses different language and talks about separate contracts and in no manner or form will it ever be regarded as a joint instrument, and yet our friends on the other side have no meaning to give to those words. They treat them as surplusage and we know that's not something we can do in interpreting documents. But I hasten to add that we're not asking the Court to write an indelible link. These contracts are typically annual contracts and they can be changed at will, and if the insurers think that they've made a mistake by putting in this separate contract language, it's only as long as until next year and they can change the forms. I want to discuss this question of equitable estoppel because that's another argument that has been briefed. The Louisiana Supreme Court has said that we can't use equitable estoppel to circumvent positive state law. They've also said that in a civil law system, estoppel means something very narrow, and they gave this notion of estoppel the kiss of death in Louisiana when they called it a common law doctrine. I do want to make sure, you can talk about it a little later, but I do want to make sure you address whether there is, I mean, y'all did talk a little bit about the fact that a public entity is different from a private entity. I'm not speaking on behalf of my colleagues, but to me, that's why we put you all together, the public, and left the private by itself on the argument, although that wasn't a very big part of the argument. I do want to know why might that matter, public versus private, as the plaintiff? Yes, Your Honor, and I think it's just another reason why Louisiana would not use this doctrine of estoppel to override its statutes. Again, there's no obligation to use estoppel, but the Louisiana Supreme Court said, when we look at this, the common law may have a broader conception, but in the civil law system, it relates to a misrepresentation and reasonable reliance on it. Now, where does the public nature of our clients come in? I think it's another reason why Louisiana, not that we need another one, the Supreme Court was clear, would not use estoppel to circumvent what the legislature has said. It's just a second reason. The real question on estoppel is, at least in the briefing, is it state law or federal law? Because if it's state law, I think it's clear, and I would submit that we had an agreement on this issue for a time in this case. When the Vinton brief was filed before Calcasieu Parish, the insurers cited Louisiana law and federal cases citing Louisiana law, and then Calcasieu Parish came out, they filed a new brief, a replacement brief, and they said for the first time, it's federal common law. Well, their briefing was similar in the Bufkin case with the same group of insurers. They argued to the Bufkin court that Louisiana cases apply estoppel, and in fact, they cited Grigson only because some Louisiana cases had seemingly embraced Grigson, and so that's the reason that they were discussing it. Bufkin applies state law, and even if Bufkin didn't decide that issue, I would suggest that creating federal common law would be improper based on Supreme Court and Fifth Circuit jurisprudence. Now, if we're going to create federal common law, or more realistically, if the judges would create federal common law, they would need some valid founts for it. They would need either a statute or a treaty that is in direct conflict with state law, and so I think it's a useful point to start with the Arthur Anderson case from the U.S. Supreme Court. It dealt with Chapter 1 of the Federal Arbitration Act, but the question arose, what role does state law have in the matter of estoppel? So if a party is not a party to the agreement with the arbitration clause, but it wants to use estoppel, or one of the other theories that are similar, would federal law allow us to look at state law? The appellate court had said no. There is no resort to state law on that. The FAA is preclusive, and you can't do it, and the Supreme Court said that was incorrect, and quoting the Supreme Court, it found nothing in the FAA that would, quote, alter background principles of state contract law regarding the scope of agreements, including who is bound by them. So we know under Chapter 1 of the FAA, state law governs estoppel, and we know as well that the FAA Chapter 1 doesn't impose any national uniform standard on the matter of estoppel. It's left to the states. This court followed the Arthur Anderson case, and a case called Crawford v. CVS Care Market, of course, recognized the new rule from the U.S. Supreme Court and considered some precedent from about 25 years ago by now called Grigson, and the question arose, well, what to do with Grigson? Because Grigson had come to be understood as relying on federal common law, and Arthur Anderson basically dispensed with federal common law and said, no, this is a matter for the states, so this court said in Crawford that the Grigson case had been, quote, modified, modified to conform to state law. So again, we know under Chapter 1 of the FAA, we know under Arthur Anderson and Crawford there is no federal common law, and so that brings the question to us now. Is there something in the New York Convention or Chapter 2 of the FAA that controls it that's different from Chapter 1 on the role of estoppel? As relevant here, the Convention is very short. It's Article 2, Section 3. It's one sentence, and I'll read it. It was not designed by Brian Garner. It's a little clunky, but it's one sentence, and it says, the court of a contracting state, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of the article, shall at the request of one of the parties refer the parties to arbitration unless it finds that the agreement is null and void, inoperative, or incapable of being performed. And so that raises a second question. Where in that sentence is the valid felt for creating federal common law and displacing the laws of the states? We know from cases like Zichterman v. Korean Airlines and Murray v. DeKalb County, we need a significant federal interest, and presumably, we would find it somewhere in the Convention or in Chapter 2 of the FAA, and that brings us to the GE case from 2020. And GE properly starts with Arthur Anderson, and that's because GE recognized that Chapter 1 and Chapter 2 are linked by Congress. Congress said in Chapter 2, which is shorter than the domestic FAA, if there's any gaps here, you can rely on Chapter 1 unless there's a conflict between Chapter 1 and Chapter 2 or with the Convention. And so again, we come back to, is there a conflict? What does the Convention say about estoppel? And Justice Thomas's unanimous opinion for the Court answered the question. The short answer is it says nothing. And the long answer to the Court's opinion is that the Convention is simply silent on the issue of non-signatory enforcement, and in general, a matter not covered is to be treated as not covered. And the Justice went on to say that the silence, quote, is dispositive here because nothing in the text of the Convention could be read to prohibit the application of domestic equitable estoppel doctrines. So again, that brings us back to Arthur Anderson. It's the same rule. Now, I'd be remiss if I didn't note that the Fifth Circuit beat GE by about 10 years in a case called Todd versus Steamship Mutual Underwriting, where it, in a Convention case, also looked to Arthur Anderson and found no conflict and said there is no special rule based on the treaty. Now, opponents rely on Bufkin, and again, to return to Bufkin, Bufkin did not rely on federal common law. Bufkin did not use the phrase federal common law not one time. In fact, as urged by these insurers who cited GE, the Bufkin Court looked to Louisiana law and federal cases applying Louisiana law. There would be no reason to cite Louisiana cases if one were trying to decide what federal common law is. The French-Spanish inspired law of Louisiana would be a poor choice for someone trying to come up with federal common law for all of the United States. It's true that Bufkin cites Grigson, but there was a good reason for that, and the insurers in their brief gave that reason. That's because before Calcasieu Parish, Louisiana appellate courts had cited Grigson as being consistent with what they thought Louisiana law represented, and we now know after Calcasieu Parish that's simply not the case. I think it was Oliver Wendell Holmes who said the life of the law has not been logic, it's been experience, and so as a watcher of this court, I would say experience suggests that Bufkin, which was a no oral argument case, per curiam case, originally an unpublished case, it seems highly unlikely that the panel there was blazing a new trail, contradicting Arthur Anderson and GE and creating federal common law and displacing the law of Louisiana. Now Bufkin was right to rely on state law, but in fairness, it couldn't have guessed what the Supreme Court did late last year, so there was an incorrect eerie guess. We now know it is Louisiana law, but Louisiana law is far narrower on the question of estoppel. Our opponents cite some cases from out of circuit, and I'll just say two things about those cases generally. Number one, not one of them will point to particular language in the treaty that would justify creating federal common law. They simply say it's a treaty, and that's not an answer to the question, that's a prelude to the answer if someone would then say, well what does the treaty say, and they never get to that point. And second, they all rely either directly or indirectly on pre-Arthur Anderson law. Final point on estoppel, the argument by the insurers is actually far broader than it seems. They address estoppel here, but estoppel runs in a pack. There are several theories like estoppel that non-parties, non-signatories use from time to time to either get rights under an agreement that's not theirs, or to impose that contract on someone else. Things like assumption, veil piercing, alter ego, and third party beneficiary. If the insurers are right here, their logic would also require displacing state laws on all of those different theories. And again, there's no support for doing that, especially after the GE case. So in sum, your honors, the district court properly denied the motions to compel arbitration. Louisiana law invalidates the arbitration clauses. The parties by the insurer's choice have separate contracts, and the backup effort to create and apply federal common law clashes with precedent. We ask that you affirm. Thank you. Thank you. Mr. Malconian, if you would like to, I would like to hear whether there is a difference between public or private plaintiffs. Let me briefly answer that, your honor. We don't think there's any difference, because we think the equitable estoppel part, there's no difference with respect to whether the convention applies directly through the text of the policy. No difference whatsoever. That argument is about the equitable estoppel part of this case, and we think there's no difference there either, because as the Bufkin panel said, we're applying the convention through equitable estoppel. So because it's the convention, it doesn't make any difference whether it's a public entity or not a public entity. The principles of Louisiana law that seem to give public entities more protection against equitable estoppel just don't apply. So that's my direct answer to your question. I'll answer a few of my friend's arguments, and then I guess in the second argument I'll give you my full equitable estoppel discussion, if that's okay. So let me start with the surplusage point. I would say it's them that are creating surplusage. They say that basically this arbitration agreement that is in the terms and conditions of the insurance policy means nothing. The text of the contract allocation endorsement that differentiates between the policy and the contract, that also means nothing. And also they can't explain how this contract possibly could be eight or ten separate contracts, depending on which case. Which contracts are they suing under? Where are the terms and conditions of the contract that they're supposedly suing under? It's in this policy. And this policy contains the arbitration agreement, which includes all the parties, the companies, are the parties to the arbitration agreement. So I don't understand this argument that we're the ones creating surplusage. The text says there's an arbitration agreement. They signed that text. They bought a policy based on that arbitration agreement in the context of the New York Convention, and now they don't want to comply with it. And I think if you read this as a whole, if you harmonize it, that's where you'll end up. Now if I could briefly respond to this argument about Bufkin. Again, I'm going to the equitable estoppel in a second. They say that Bufkin was applying state common law. That is just incorrect from our view. The last two paragraphs of Bufkin are extremely clear about what the court was doing there. And I should say, my friend on the other side says this was a procurium. This is a published opinion of the Fifth Circuit. It is bound by the rule of orderliness, and it binds this panel. Unless they want to take it on bond, which is fine. We'll fight that out there. But right now, Bufkin is the law of this circuit. And what this court said in the last two paragraphs of Bufkin is, contrary to Bufkin's contention, this conclusion does not run against Louisiana public policy. The Convention is an exception to Louisiana's general bar on policy terms that deprive its state courts of jurisdiction. This court has 22868 does not reverse preempt the Convention because McCarran-Ferguson does not apply to treaties. And then it ends with this. The arbitration agreement between the parties is subject to the Convention through equitable estoppel, and there is no tension between this position and Louisiana law. That is because there is no tension because this court was applying federal common law, not Louisiana law. There is no hint of an eerie guess, as my friend suggested in this opinion. No one asks what the Louisiana Supreme Court thought or the Louisiana Intermediate Courts thought. They say that this is a Grixen case, and Grixen is a question of federal common law. Let me turn you one other part of Bufkin, the very last paragraph. Our friends on the other side asked to certify the question to the Louisiana Supreme Court. This court said no, not because we've made an eerie guess and we have a good sense of what that court would do, but because it is unnecessary because we have resolved this case on Grixen estoppel grounds. And again, Grixen is a case applying federal common law. So if you read Bufkin's published opinion of this court, that's what this court was doing. Now my friends on the other side, and I'll get to this more when I have more time, cite all these cases like Crawford, Todd, Odukumpu, all these cases. Not a single one of those holds that under the convention, equitable estoppel is governed by state common law. All of them leave that question open. Odukumpu leaves that question open directly. The Supreme Court says in Odukumpu, we're not deciding that question. Eleventh Circuit, go ahead and you take that issue. And on remand, there is a special concurrence from Judge Choflat that says, I would have decided it on that ground. The rest of the panel decides it on a different ground on remand. I would have decided it on that, and it is clearly federal common law that controls, because this is a treaty of paramount importance to the United States. We urge you to reverse. Thank you. Okay. Thank you to both sides. We appreciate you. We are going to hear another case that's got some similarities.